On behalf of Mr. Nyden, Paul Glazer, on behalf of the athlete, Mr. Scott Jacobson. Good morning, gentlemen. Good morning, ladies. Counsel, and please the court. Edward Nyden appeals his conviction for the offense of aggravated battery, which followed a bench trial in Kane County. My client did not deny engaging in the conduct which led to the bodily harm to the complainant, Michael Casey, but he said he had a good reason for doing so, raising the defense of justified use of force in defense of person. Illinois law tells us there are six factors going into whether there is self-defense. Unlawful force is threatened against the person. The person threatened is not the aggressor. The danger of harm is imminent. The use of force is necessary. The person who is threatened actually and subjectively believed the danger existed which required the use of force. And lastly, the beliefs of the person threatened were objectively reasonable. The state will come up here and tell you it's not the job of this court to re-weigh the evidence that the trial court heard the witnesses and made a credibility determination this court can't undo. We are not conceding the credibility of the state's witnesses by any means. We're not asking for any re-weighing here. Rather, Judge Simpson in her findings of fact made all the requisite findings that would have satisfied the self-defense defense. But she erred in not applying them in a rational manner, in a manner consistent with human experience. She said that it sounded like Mr. Knight was afraid when he drove away with his car. But he acted unreasonably because he knew that Knight, that Casey's arm was in the car, was likely going to be dragged. And that's the crux of this case, that had Mr. Casey not put his arm inside the car, he would not have been dragged. Well, now, is it his arm or his head? Because there seems to be hands. I mean, are you now saying it just was his arm? Well, the defendant, my client and his nephew both testified that Casey put his hands around my client's neck and said, get out of the goddamn car, after seeing his Harley get knocked over and damaged. The family said that at the time of trial. When the police officer questioned Mr. Knight, he never said any of that, did he? No. When the police officer talked to Mr. Casey at the police station, Casey said, I had my arm in the open window. Now, this is the end of June. It's a fairly warm up. My client's driving a Honda Accord with the window open, driver's side window open. Although the bartender, who's a longtime friend of Mr. Casey, says, oh, Casey's short. He didn't have to lean over. This court can take notice of the relative height of a Honda Accord in the window. Mr. Casey himself admitted that he leaned over to go eye to eye with my client. And in doing so, he put his arm on the open window. That's pretty close. My client's head was not that far from the window on a Honda Accord. Whatever it was, your client decided to speed away. And the victim, somehow, whether it was I was in or out or got caught on a mirror or whatever, he was caught such that he couldn't discharge himself from the vehicle safely, and he got hurt. Correct. So that's the – you cite in your brief, you cite Keefe for the proposition that self-defense necessarily involves a question of whether or not the defendant subjectively believed that force was used, that force use was necessary. But the case goes on to say that the determinative question is whether or not the defendant's belief that it was necessary to use deadly force was reasonable under the circumstances. So the defendant has to both subjectively believe but also reasonably believe that deadly force was necessary. It was reasonable. Let me make a couple quick factual corrections. What's the obligation under the law when somebody causes property damage to another vehicle? To stop it. To stop it and remain there.  My client's not being prosecuted for leaving a seat in an accident. I'm just talking about just common sense and what's reasonable. Everybody who drives a vehicle knows that if you hit another vehicle, you're supposed to stop and remain unseen until the police arrive, correct? That's absolutely correct, Your Honor. The White case says the law doesn't require a person to use inerrable judgment when deciding whether to use force or not in their own defense. But there's a – again, on that issue, there's competing in terms of what's reasonable, engage in conversation, wait there for the police, resolve the issue. The victim's trying to get your client to stay. Your client makes his judgment. It's time to leave, and he takes off at a high rate of speed. Any reasonable person, after knocking over an expensive Harley Davidson road-glide motorcycle, which is a five – no evidence on the record of how much it's valued, but it's definitely not a cheap motorcycle. This is a five-figure motorcycle. After knocking over that motorcycle in a biker bar, damaging the car, being confronted with the bike's owner who is leaning over, at some point leaning over close to the – whether he breaks the plane or not, I don't know for a fact, but there's no way – it's the old story of, you know, Abe Linton questioning the witness, you know, how do you know that my client bit the guy's ear off and he says, well, I see him spit it out. There's no way that Mr. Casey would have gotten his arm caught in the doorpost of the car, not the side view mirror, but the doorpost, because the car is going that way. He wouldn't have gotten his arm caught in the doorpost if his arm wasn't in the car. If he was standing back like the know-it-all bartender had testified, he could not have been hit by the car. This is not a situation where my client went back seeking revenge on Casey with a gun or tried aiming with a car. I got a case with someone hitting someone with a car. That's a whole different case. Where did your client go after the victim was finally discharged from the vehicle? Away. That's all we know from the record. He didn't remain in the scene? No, he drove away where he was arrested. Is that a fact that the court can look to, determining whether or not the defendants believed throughout this entire – Sure, sure. He's being chased by people at the bar. Any reasonable person – Who else is chasing him? The bartender is, and he doesn't know that this guy Casey isn't going to be chasing him. He's afraid. He's 68 years old. He's got a heart condition. His nephew in the car has got a brain tumor condition. He's confronted by a big – He took him out for a beer. I don't know his age. I know what his age is. It's not in the record, but I assume he's over the age of 21. I'm not worried about that illegality. It just seems like a rather unusual thing to do with a person – Well, I suppose it is, but I suppose he has a right to some pleasure, too. Being confronted by this biker, this burly biker, I asked him when I was looking at People's Exhibit once, all the evidence we have in this record of what Mr. Casey looks like. He's a burly guy with a ZZ Top kind of beard. He's wearing a T-shirt saying, bite me on it. By his own admission, he said he drank two or three beers before his bike got knocked down, his valuable Harley got knocked down. Any person in that kind of position, seeing this guy's arms within inches of his head, especially if he's 68 years old with a heart condition, any such reasonable person would have interpreted the biker's actions as presenting an imminent threat of harm. And he drove away. He drove away. He didn't go after the guy. He drove away. Reading your brief, it almost sounds like he thought everybody who was sitting in that patio was going to come after him, but there's no evidence about that, is there? No. Well, the evidence shows that there were seven or eight people at the bar earlier in the afternoon. In fact, the bartender said they were rather busy that afternoon. A lot of bikers that afternoon at the bar. We don't know how—she says the only people left in the— there's a bar, the inside bar, and there's a beer curtain from the outside. I think the reasonable interpretation of the testimony from all sides is that the only four people at the outside at the time were my client and his nephew and Casey and the bartender. So my client was probably exaggerating things a little bit when he said, oh, the whole bar was going to come down at me and attack both of us. But by the same token, it's his subjective belief that this guy here, this big lug with the bite me T-shirt is going to kill me because I messed up his bite. That's a reasonable belief. Again, he drove away. He didn't go at Mr. Casey. He simply took off, and Casey, who was in the car— that's how his arm got looped by the car, because he was inside the car. A car is still going to be bigger than a foot, right? He didn't hit his feet. The only part of Casey's body that got at all connected to this car was his arm. And after he said he was dragged about 40 feet, which is only an estimate, he was dragged, and he had a couple of scratches. I think his photo will show a couple of minor scratches on his arm. He didn't wreck any clothes. He didn't—he had a headache, probably from the beer. He didn't—no broken bones, no bleeding, just a couple of scratches. The same kind you get from trimming your hedges on a Saturday afternoon. The evidence below simply is unsatisfactory to justify a reasonable doubt in my client's guilt. He therefore respectfully asks that his conviction be reversed. Thank you. Good morning, Your Honors. May it please the Court. Good morning. I would take it, given the fact that there are three of you up here, that I am in the appellate court and not the trial court, I think the defendant's arguments would be much more persuasive had the case not already been resolved against him by the trier fact. The trier fact made a thorough factual ruling in this case. She determined that the victim did not threaten unlawful force against the defendant, negating the first element of self-defense. And she ultimately went on to find that his—that he lacked the subjective belief that the use of force was necessary. What was her comment about fear? And he was—I've taken into account fear. So if she's taking into account fear, what's he afraid of? If he's not afraid of Mr. Casey, what's he afraid of? I think if you look at page 130 of the record, where the defendant's being cross-examined, at this point in time, by the time we get to page 130, the defendant kind of—  he didn't see the victim's arm by the time he put the car in drive. And then this is the exchange. I'll just read it to you very briefly. So at that point, the time that the defendant put the car in drive, nothing was happening. Was there a reason for you to take off, defendant? Yeah, I feel like I'm going to be beat up, you know, like motorcycle gangs torture people and you read about it all the time. Think about that. Question, what is happening at that time? You say he, the victim, grabbed your neck and that he's not grabbing your neck anymore. Where is he standing before you put the car in drive? Answer, I don't know where he's standing. I'm gone. I ain't going to stay there and get beat up. Question, well, before you put it in drive, he's not grabbing your neck anymore. Answer, that's because I'm in gear. I'm going. I don't know about him anymore. He grabbed my neck. If I had a gun, I probably would have shot him. So isn't that a reasonable belief of a need to defend himself? I think the trial court, in listening to the defendant's testimony, rejected the defendant's statement that he was in fear and that he needed to use force. Do you think if this were a jury trial that the defendant would have been entitled to a self-defense instruction? Absolutely. Absolutely. No question. But, you know, the merits of giving the instruction are quite different from the merits of acquitting the defendant based on self-defense. I think given the trial court's resolution, extensive resolution of the factual issues in this case, it was certainly within the trial court judge's promise to disbelieve the defendant's testimony regarding fear. As Justice Burkett pointed out before, it may well be the fact that the defendant left the scene of the accident was his intent from the beginning. I don't know. All I know is that the trial court examined the defendant's testimony, found him not to be credible, and determined he did not actually subjectively believe that the use of force was necessary. And she further determined, as required from the first element of self-defense, that the defendant was not threatened with unlawful force. So, I mean, the size of the victim, the age of the defendant, the circumstances as to why they were there, those were all issues that were presented to the trier of fact. They were all conclusively resolved against the defendant. This issue has already been determined, at least on the facts. Yes, was it Ms. Murphy, the bartender, or the bartender? Did the court comment on whether the relationship between the bartender and Mr. Casey in any way impacted her? No, she did not. When I say she, I'm sorry, Judge Simpson did not say anything about the nature of the relationship between Alicia, and you're right, I can't remember her last name, Alicia and the victim. But it was, I mean, he went in there on a regular basis, she had been a longstanding bartender, so as counsel puts it, I think he said they were good friends, but they obviously knew each other. Yeah, I'm sure they were acquainted. I don't know that that, I mean, you know, the trial court independently found Casey's testimony credible, and then independently found Alicia's testimony credible, and then Officer Murphy's testimony credible. I don't, I mean, whether or not they knew each other has, to me, no relevance on the issue. I mean, maybe. Does that have bias? It would. Again, these witnesses testified in front of the trial court. The trial court resolved any, I mean, to the extent that we're talking about bias, the trial court resolved that Alicia wasn't biased and found her credible. If the trial court thought Alicia was biased and therefore incredible, that was the province of the trier of fact. Did the trial court comment on the nephew's testimony? Did she acknowledge the issues that he might have had? Yes. I believe she stated that due to the nature of his condition and or the fact that he might have been drinking would tend to influence his testimony, or at least his recollection of the events. Didn't he say he was afraid that something was going to happen to him? I believe he did, yes. And, again, Judge Simpson found the defendant and the defendant's nephew. She found their version of events not to be credible. Was he trying to get out of the car because he was frightened or because he wanted to see what happened? Is that clear from the testimony? I don't think it is, no. I think either is plausible. I mean, to the extent the defendant pulled him back in the car, I don't know if that's because the defendant was fearful of his nephew getting out of the car or didn't want his nephew to inspect the damage and just wanted to take off. I don't know. All I know is that these various factual accounts were presented at a trier fact. They were argued, and they've been resolved conclusively. Did the defendant say anything to Mr. Casey during this brief encounter? I don't believe anybody testified that the defendant said anything. I don't think it's unreasonable to think that maybe the defendant was a little bit fearful, given the circumstances. I mean, there's nothing unreasonable about that. He's an elderly man. He does have a heart condition. He hit a motorcycle. I understand that these thoughts might race through somebody's head, but the impulse to put the car in drive when confronted and speed away, especially when somebody is attempting to have a conversation with him, I mean, to me, I can't relate to that impulse. You would have stuck around. I would have, yes, in that situation. Now, had this been the throng of bikers, which Judge Simpson said was not the case, but had this been the throng of bikers charging at me, a different story. I do think the defendant's account of things is a little bit fantastical, and with respect, I think the presentation of those facts on appeal as conclusive evidence before this court simply overlooks the fact that that's just one factual account of the situation among many. Was there any evidence? I think Mr. Gia Donato talks about he tore the shirt the defendant was wearing. Did the police officer observe any disruption? No, he did not. Apparel problem? The defendant contradicted that aspect of his nephew's testimony. The defendant said that his shirt had been, he didn't remember what shirt he was wearing, but then he remembered it was probably a striped shirt. He said it wasn't ribbed, but he thought it was pulled. So, I mean, to the extent that we have this big, burly, you know, bite me T-shirt guy with an arm reaching into the car, well, that just, according to Judge Simpson, was not the case. I mean, she rejected that aspect of the testimony. It may well have been that he was leaning down and put his elbow in the car, and the defendant just took off. Well, she didn't reject the fact that he was wearing the shirt and he looked like it. No, no. I do think a bite me T-shirt is a little bit, you know. Well, unless it had a mosquito on it, it might have been frightening. That all is well and good. I don't think it has, I mean, I don't think you can infer from the fact that this man is a Harley. I mean, unless this court wants to fashion a rule that anytime a 68-year-old defendant with a heart condition has been drinking and is taking care of his nephew. Drinking? He was drinking tea, wasn't he? I believe Alicia said that he had at least one beer and that he had took his nephew out, and I think she said something about cutting the nephew off. So I don't know what the magic number was for the nephew, but at that point she decided to cut him off. The officer smelled alcohol in the defendant's breath. Maybe the defendant was fearful he was going to get a DUI. I don't know. There are certainly, it's the difference between a college-level philosophy course asking questions like, what if, and what is possible in this situation, versus this is the record that the parties presented below. The trier fact made these determinations. I would submit on the defendant's argument there's really nothing for this court to do but affirm. Thank you. Mr. Glaser? Here's a couple of factual cleanups here. The T-shirt may, in fact, have had a mosquito on it. This is Skeeter's Bar, and I think it's like a vernacular for mosquito, Skeeter's Bar. I spend a lot of time in Minnesota. Well, Carter was really the driver. This is a biker bar, there's no question about it. And this is a biker, no question about that. And this bike didn't fall down and get damaged, no question about that. John Giuginato, the nephew, did testify that he was trying to stop how Carter filed a police report when he opened the door and his uncle grabbed him and pulled him back in. And, in fact, Alicia Wright said she didn't see the door open as it was pulling away. So some of that testimony is corroborated. Casey himself testified that he and Wright, the bartender, were friends, were good friends, were friends at least for five years. This is page 25 of the record. The nephew's testimony about opening the door is a police report. It's at page 106. The officer's testimony about smelling the alcohol on my client is very curious because, first of all, I would have noted down when the questioning in the police station occurred and I didn't, so I'm not sure if they even established when the defendant was arrested and when he was questioned. But for assuming my client had one beer, which is all that Ms. Wright testified to, this officer was able to smell beer out of my client's breath sometime later that night, even though when he goes to the bar to talk to Casey, who by his own admission had two or three beers, including only a beer, waiting for the police officer to get to the scene, didn't smell the alcohol on him. It's all real sketchy. He was too afraid to get too close to him. Maybe. It could be. Or he couldn't. Well, whatever it is. I mean, again, we can't re-weigh the credibility. I'm okay with that. But when the judge made her decision, page 164, she says, any reasonable person should have known that there was a good chance of bodily injury with his arm being in the car. And she says later, 167, we need to look at the totality of the circumstances. That's not really the standard for self-defense. But the circumstances include the fact that Casey had his arm in the car. You can say, one, Casey and Wright, the contingent, they're friends and their credibility is suspect, and my client and his nephew are suspect. But you can't get away from the subjective fact that Mr. Casey had his arm inside the car. And the only reason that the arm inside the car, or only effect of him having the arm inside the car, was to cause my client to be fearful for his safety and the safety of his nephew. Or just to lean in and chat with him. I mean, I'm having a problem here, Mr. Blaser, with our standard of a review. Tell me how we get around that. I mean, any evidence. Because I don't think a rational jury would view a person who's had his valuable property damaged as being a cow-collected individual saying, oh, excuse me, kind sir, do you happen to have insurance? Which brings me to the next question. Why would you take a bench tram? Why would someone take a bench tram? It wasn't my call. I don't know. I know that. I don't know. That's probably the biggest question of the whole case. So why would you vote the jury on this case? But be that as it may, the unstable evidence is my client caused injury to the man because he hooked his arm in the car. And if the man's arm was not in the car, he wouldn't have been hurt. And that's the self-defense. Further questions? I think not. Thank you. Gentlemen, thank you for argument. A decision will be rendered in due course, and we will take one last business.